[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This action is based on an amended complaint dated April 20, 1988, in which the plaintiff sets forth three counts claiming in the first count that the defendant breached its express warranty; claiming in the second count that the defendant breached its implied warranty of fitness; and in the third count, that the defendant breached its implied warranty of merchantability with the plaintiff. Plaintiff claims as damages (1) recovery of the purchase price; (2) damages for non-delivery of the mold and shelves; (3) the amount for the purchase of the mold; (4) the difference between the plaintiff's cost to cover the contract price; (5) incidental damages; and (6) consequential damages including loss of business and profits; and (7) such other damages as may be appropriate.
The defendant filed an answer, special defenses and a counterclaim claiming monetary damages, incidental damages and costs against the plaintiff.
A trial of the matter was held over a course of eight days from June 19, 1991 until October 4, 1991. Briefs, CT Page 1731 reply briefs and rebuttal briefs were filed up until April 7, 1992.
After a review of the testimony and exhibits in the above-entitled matter, the Court finds the following facts.
(1) Sometime early in 1983, probably during the month of February, John G. Visser (hereinafter referred to as "plaintiff") began to design a dairy cart for milk containers in which the shelves would tilt after loading. The plaintiff intended this tilting feature to provide retail customers with ready access to product and to save labor for retailers in loading the product.
(2) This cart was unique in that no other manufacturer was selling a tilting dairy cart at this time. The cart was also, from all appearances, an improvement over the existing court systems being used by dairies in the United States.
(3) In early 1983, the plaintiff built a prototype dairy cart with plywood shelves in order to test different plastics for use as the shelves.
(4) In early 1983, the plaintiff met with representatives of the Penda Corporation who prepared a drawing and a quotation for a plastic shelf made out of high density polyethylene. This drawing consisted of a solid shelf.
(5) Larry Marino, Sr. of Rogers Manufacturing was the sole sales representative of the defendant in May and early June 1983.
(6) Larry Marino, Sr. contacted the plaintiff in an attempt to obtain business from him and arranged for a meeting between the plaintiff and Mr. Vincent Bitel, Sr., president of the defendant corporation. This meeting occurred in early June 1983. At this meeting, the parties discussed the dimensions, composition and parameters for the shelf to be constructed. The plaintiff indicated that the tray could not be solid as shown in the Penda drawing because of the cleaning requirements of the dairy industry. In addition, the plaintiff showed the defendant a prototype cart frame with steel support bars for the shelf in the front and CT Page 1732 in the center explaining that the shelf needed to be strong enough to support the intended load within this steel structure.
(7) Plaintiff advised the defendant that the shelf would have to carry weight of 220 pounds.
(8) The defendant prepared a tentative drawing of the shelf based on its discussion with the plaintiff, and this drawing was reviewed by the plaintiff at a meeting with Vincent Bitel, Sr. and one Fred Ross, an engineer for the defendant corporation.
(9) At this second meeting, the plaintiff requested the defendant to make certain changes such as reducing the height of the front rail and the defendant explained to the plaintiff the need for a steel safe design of the mold that is the need to initially design the mold with more steel in the cavity with a concomitant reduction in the size of the plastic part because it is far easier to remove steel from the mold cavity than to add steel. The defendant further explained to the plaintiff that steel safe mold design necessarily required development of and revisions to the mold in stages.
(10) The so-called steel safe type mold design and revision is normal in the industry and it is rare that acceptable parts are produced in the first run of a mold.
(11) On or about July 12, 1983, the defendant sent to the plaintiff a written quotation to manufacture the shelf (Exhibit L), and this quotation provided that the shelf would be made out of high density polyethylene, that the cost of the mold $50,000 would be shared equally, that the unit price would be $8 if ordered in lots of not less than 500, that upon receipt of a purchase order, Rogers would prepare a product drawing consistent with changes which were discussed and that the tooling would take 16 to 20 weeks.
While the quotation failed to state the starting date for construction of a mold and tooling, the Court finds that the starting date was July 23, 1983, at which time plaintiff and defendant met at defendant's plant in Rockfall, Connecticut, and the plaintiff presented defendant with a letter accepting the quotation subject to certain additional CT Page 1733 terms. Those terms were agreed to by the defendant.
(12) One of the most important additional terms provided that the plaintiff would reimburse the defendant for its share of the mold if the plaintiff did not purchase a minimum of 25,000 shelves.
(13) Under the terms of this letter agreement, it was the defendant's responsibility to build and test the mold, to accept design responsibility in order to make the shelf moldable, and consistent with steel safe procedures, design responsibility in order to make the shelves strong enough within the supporting steel structure of the cart.
(14) The defendant agreed to make changes and put in details as needed in the drawing and used their engineer, Fred Ross, to do this work. This work took approximately four to six weeks.
(15) In September 1983, the defendant's drawings were in their final stages, and the defendant suggested to the plaintiff that it make a prototype mold. When the plaintiff found out that it would take five or six weeks to make the prototype mold, the plaintiff said no and prevented the defendant from making a prototype mold.
(16) As late as December 1983, the width of the shelf was changed at the request of the plaintiff (Exhibit 27, revision #6). As late as December 7, 1983, changes were still being made to the mold.
(17) The defendant decided to subcontract out construction of the mold to Instamatic Company of New York. Instamatic then decided to have the mold made in Portugal. At this point in time, namely 1984, Portugal was the leading country in the world for the manufacture and production of molds.
(18) The defendants never represented to the plaintiffs that they themselves would make the mold at their plant in Rockfall, Connecticut.
(19) The mold was first completed in late January 1984, and both plaintiff and Vincent Bitel, Sr. traveled to Portugal to examine it and observe the first test run of the CT Page 1734 mold.
(20) When the plaintiff and Mr. Bitel arrived in Portugal, Mr. Bitel made several changes which took two or three days. After the trial run, Mr. Bitel admitted that the shelf had more flex in it than he had anticipated. Mr. Bitel suggested approximately eight changes to be made to the mold before it was to be shipped to the United States.
(21) The mold which weighed approximately 7,000 pounds was shipped to the United States in April 1984.
(22) Upon his return from Portugal, the plaintiff continued to provide research and development on the shelf until at least June of 1984. The plaintiff did work on the technical items such as modular strength, tensile strength, temperature tolerances and lubricity. In addition, he met with a number of engineers and contacted several plastic manufacturers and purchased at least four different resins.
(23) Sometime in late February 1984, at the plaintiff's request, Vincent Bitel, Jr. looked for possible substitute resins that would meet the plaintiff's criteria.
(24) As a result of this search, Vincent Bitel, Jr. located 40 percent glass-filled HDP ("40 percent glass") and brought that material to the plaintiff's attention. Mr. Bitel, Sr., however, was of a different opinion and advised the plaintiff that the material would not be suitable and recommended that the plaintiff continue to use HDP with certain mold modifications as and when necessary.
(25) In April 1984, the defendant ran tests of the mold using HDP and 40 percent glass. The plaintiff was present at these tests but the defendant only had an extremely limited amount of material and could only run a few tests which were not conclusive.
(26) In early June 1984, the defendant ran additional tests on the mold using 40 percent glass and produced at least 84 shelves for the plaintiff's review and inspection.
(27) In early June 1984, the plaintiff accepted delivery of these samples and ran tests on them in the field. CT Page 1735
(28) In late June 1984, plaintiff sent defendant a speed letter in which he requested certain specific changes in the shelf as a result of these tests and inspections of the sample.
(29) This letter only requested five specific changes in the shelf, none of which involved the strength of the shelf.
(30) In June 1984, the defendant sent Instamatic a purchase order regarding most of the mold changes requested by the plaintiff. The defendant was to make the remaining changes on it, own.
(31) On October 6, 1984, the defendant produced 69 shelves for the plaintiff's review and inspection. The plaintiff was present at this test run and accepted delivery of these shelves. The plaintiff registered no complaint with the defendant regarding these shelves but instead requested the defendant to order more material.
(32) Defendant ordered more 40 percent glass material, and on October 29, 1984, produced 270 shelves at the plaintiff's request.
(33) The plaintiff accepted delivery of these 270 shelves and registered no complaint about them with the defendant.
(34) In late 1984, Messrs. Bitel, Sr. and Jr. met with the plaintiff in Pennsylvania and agreed upon a price of $12.50 per shelf retroactive to all prior invoices.
(35) At this meeting, the only complaint of the plaintiff about the quality of the shelves was regarding the minor burn marks. Bitel, Sr. advised the plaintiff that he could take care of the problem of the minor burn marks.
(36) Subsequently, defendant issued a credit memo regarding the price modification, and in December 1984, sent to plaintiff an invoice for the revisions to the mold. Plaintiff did not register any complaints at this time.
(37) In early 1985, at the plaintiff's request, CT Page 1736 the defendant ordered additional 40 percent glass and produced 563 shelves. These shelves were shipped to the plaintiff who accepted them.
(38) The plaintiff registered no complaints concerning the March 1985 shipment, but instead, requested the defendant to order more 40 percent glass which the defendant did.
(39) The decision to use 40 percent HDP as the material was the sole decision of the plaintiff and was made over the objection of the defendant.
(40) Shortly thereafter, all contact between the plaintiff and the defendant ceased.
(41) During the period of March 1984 until the date of the trial, the plaintiff has, on various occasions, claimed to be totally disabled. He is receiving $3,000 per month on disability from two different insurance companies and is also receiving social security disability. The remarks and statements he has made in connection with obtaining disability insurance payments together with his criminal record consisting of several convictions in the not-too-distant past raise very serious questions in this Court's mind about the credibility of the plaintiff. For an example of these statements, see Exhibit QQ.
(42) The plaintiff attempted to negotiate a licensing agreement with Cannon Equipment Corp. ("Cannon") for the sale and manufacture of the tilting dairy cart. This was during the period of late 1985 to approximately the middle of 1986.
(43) The plaintiff also attempted to negotiate a licensing agreement for the sale and manufacture of his cart with Cumberland Corporation. The efforts of the plaintiff to negotiate a licensing agreement ceased approximately September 1987.
(44) The plaintiff then attempted to negotiate with Piper Case Pro regarding a license for the sale and manufacture of his tilting dairy cart. These negotiations lasted for several months from approximately November 1987 to January 1988 at which time the parties, namely the plaintiff CT Page 1737 and Piper Case Pro, entered into a license agreement.
(45) On May 9th, 1985, the defendant placed an order for 40,000 pounds of material to produce additional shelves. Defendant received 10,000 pounds at 95 cents per pound and was required to pay $9,500 plus $2,350 to return the material. The plaintiff never followed through with any additional orders and the next contact from the plaintiff was a letter from his attorney, Mr. Adams in Middletown, which was received in September 1985.
(46) Shortly after September 16, 1985, the plaintiff and Mr. Bitel, Sr. and Mr. Bitel, Jr. held a meeting. The Bitels indicated that they were surprised and upset by the letter from Attorney Adams and the plaintiff indicated that he was still having trouble with new shelves produced by the new mold due to water or moisture drainage and he preferred the defendant's design to the solid shelf he was presently using. The Bitels indicated that they could probably do something if the plaintiff would put it in a letter and that they would get back to him within seven days. The defendant never heard from the plaintiff again prior to the commencement of this action.
(47) The plaintiff had a great deal of experience with plastic in the dairy business in particular. He spent 35 years working in the dairy business for various companies, primarily for Johanna Farms where he was in charge of a considerable amount of machinery and in a supervisory position. The plaintiff developed some machines in the past and had developed a cart for Doran-Danbury. Plaintiff was also familiar with injection molding, had subscribed to and read various magazines and publications on plastics and was in general quite familiar with plastic injection molding process for developing various parts.
This Court also finds that this transaction is governed by Article 2 of the Uniform Commercial Code. While there was a service component involved, namely the creation of the mold, the transaction basically concerned a sale of goods. Had the parties' original desires been carried out, the cost of the mold was approximately $50,000 and the contemplated sales were approximately $625,000 and the sale of goods component or portion of the transaction clearly predominates. The basic idea and concept obviously belonged CT Page 1738 to and was the brain child of the plaintiff. He stated under oath in his patent application that he was the original, first and sole designer and inventor of the cart and its components.
The plaintiff made the determination to change from HDP to 40 percent glass and Mr. Bitel, Sr. and Mr. Bitel, Jr. advised against using the 40 percent glass material. The plaintiff has not proven the existence of any express warranty or that it was breached. This Court agrees with the defendant that it would be legally inconsistent to find that the defendant expressly told the plaintiff that the material substitution was likely to prove unsuitable and that the defendant also made some positive express warranty within the meaning of Connecticut General Statutes 42a-2-313(1), which states as follows: "Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed whenever reasonable as consistent with each other."
The second count of the plaintiff's complaint claims a breach of an implied warranty of fitness for a particular purpose. Connecticut General Statutes 42a-2-315
provides as follows: Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is, unless excluded or modified under 42a-2-316
an implied warranty that the goods shall be fit for such purpose.
The implied warranty of fitness for a particular purpose requires "that the seller have reason to know of a buyer's particular purpose and of the buyer's reliance on the seller's skill and judgment as well as actual reliance and fact by the buyer." Standard Structural Co. v. Bethlehem Steel Corp., 597 F. Sup. 164 (D.Conn. 1984).
In order to create the first of these warranties, the implied warranty of fitness or a particular purpose, the plaintiff must demonstrate that the seller knew the buyer's particular purpose, that the seller knew that the buyer was relying on the seller's skill to provide a product that would satisfy the particular purpose, and that the buyer did, in fact, rely on that skill. The existence of this warranty, CT Page 1739 therefore, depends in part upon the comparative knowledge and skill of the parties. Blockhead, 402 F. Sup. 1024.
In official comment 9 to Connecticut General Statutes 42a-2-316, it is stated that when the buyer gives precise and complete specifications to seller, there is usually no reliance by buyer on seller and therefore no implied warranty of fitness for a particular purpose. In reviewing the plaintiff's background and knowledge of plastics, blow molding and injection molding, together with his decision on the type of material to be used and overriding the defendant's recommendation, this Court agrees with the defendant that it is legally impossible for him to establish the reliance elements required by Connecticut General Statutes 42a-2-315.
In count three, the plaintiff makes a claim for breach of implied warranty of merchantability. This warranty does not arise in connection with the sale of specially ordered, unique goods. This is because these types of goods, by definition, cannot be measured against an "ordinary purpose" or "pass without objection in the trade" standard, which standards are the hallmark of merchantability. See Connecticut General Statutes 42a-2-314(2).
After a review of the paragraph that follows from the above, this Court finds in favor of the defendants on counts one, two and three of the plaintiff's complaint.
The defendants, in their counterclaim, are seeking $24,018 for failing to purchase a minimum quantity as per agreement, $4,650 for failing to reimburse them for extra costs in building the mold, and $2,375 for the restocking charge for 10,000 pounds of 40 percent glass purchased in April 1985. The agreement between the parties to reimburse Rogers at $25,000 less $1 for each shelf ordered in the event that they did not purchase 50,000 shelves as originally planned was predicated upon a cost of the mold being $50,000 and the defendant paying one-half of that amount. This Court found no evidence that the defendants had, in fact, paid that amount, namely $25,000, or any evidence as to what the actual cost of the mold was and therefore is not going to allow damages with regard to that item.
The $4,000 for the extra was clearly optional on CT Page 1740 the part of the plaintiff, and there was testimony from the defendants that he could pay that if he wanted to. It was up to him.
The $2,375 re: stocking charge is an expense incurred by the defendant to which they are entitled to reimbursement. The Court finds in favor of the defendant on its counterclaim in the amount of $2,375.
R. T. O'Connell, J.
Judgment Entered in Accordance with Foregoing Memorandum of Decision. Michael Kokoszka, Chief Clerk